Michael S. Hiller, Esq.
**WEISS & HILLER, PC**
Attorneys for Defendant American Stevedoring, Inc.
600 Madison Avenue
New York, New York 10022
(212) 319-4000
mhiller@weisshiller.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MORAN TOWING CORPORATION,

                Plaintiff,

  - against -                             11 Civ. 2636 (SLT)

THE BARGE NEW JERSEY,
HER TACKLE, ETC. *IN REM*, THE             **AFFIDAVIT OF**
BARGE NEW YORK, HER TACKLE,           **SABATO CATUCCI**
ETC. *IN REM*, AND AMERICAN
STEVEDORING INC., *IN PERSONAM*,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

State of New York  )
                      : ss.:
County of New York  )

        **SABATO CATUCCI**, having been duly sworn, deposes and says:

        1.       I am, and since 1956 have been, in the transportation business, and since 1991, have been the Chairman of American Stevedoring, Inc. ("American"),[1] one of the defendants in this action. I am fully familiar with American's operations and relationships. I submit this affidavit in support of American's Order to Show Cause. As reflected in the Declaration of American's attorney,

---

[1] I rely upon the same abbreviations and other capitalized expressions as appear in the Declaration of Michael S. Hiller.

Michael S. Hiller, and the accompanying Memorandum of Law, American is entitled to an order vacating the orders and warrants which authorize the arrest of the Barges. And, most importantly, as also shown below, in the absence of an interim order allowing American to use the Barges pending the outcome of this Order to Show Cause, American is out of business *today*, causing irreparable harm, not only to American, but also to its employees, unrelated third parties and the general public.

## BACKGROUND

*American's Business*

2.  American is a multi-service marine terminal operator and transportation service provider, operating marine terminals, piers, and upland port facilities spanning more than 100 acres at the Brooklyn and Newark Ports ("American's Port Facilities").

3.  American's business consists of loading and unloading bulk and breakbulk (non-containerized) cargo, and storing goods and other materials for, among others, shippers, truckers, manufacturers, distributors and retailers worldwide. The ships transporting the cargo are typically between 600 and 800 feet long. Cargo is shipped in closed containers (ranging from between 20 and 40 tons each), as over-dimensional or heavy-lift cargo (*e.g.*, large, single-piece items, such as transformers), or as open (breakbulk) cargo. Ships arrive at and depart from American's Port Facility in Brooklyn everyday, in accordance with scheduled arrivals contracted upwards of six months in advance. Upon arrival of the ships, American's more than 350 employees load and/or unload hundreds of thousands of tons of goods and other materials, including onto and off of the Barges, which are transhipped across the Hudson and East Rivers. Approximately 75% of the cargo that arrives at American's Port Facilities is then shipped by the Barges across the Hudson and East

Rivers. Shipments received in American's Port Brooklyn Facility, known as the Red Hook Container Terminal ("RHCT"), are loaded onto the Barges which are then towed across the rivers from New York to New Jersey, to be transhipped, either by rail or truck, to destinations across the United States. (There is no rail facility in Brooklyn.) Similarly, cargo that is shipped *to* Newark by either truck or rail, is loaded onto the Barges and then towed across the Hudson and East Rivers *to the RHCT* where it is transsshipped to container vessels or trucks for delivery locally and worldwide. By reason of their special construction and fittings, the Barges provide the *only* means of shipment of cargo across the Hudson River. And the Barges provide the only means by which cargo can be shipped into New York City and transported by rail throughout the Country.

4. Plaintiff is a towing service company which operates tugboats that have transported the Barges across the East River and Hudson River.

5. The Barges do not have engines and lack any navigation instrumentation. Accordingly, when plaintiff tows the Barges across the East and Hudson Rivers, plaintiff has complete control over them. There is simply no possible way for the Barges to escape unless plaintiff arranges for it.

6. On an annual basis, American loads and/or unloads in excess of 2.5 Million tons of cargo. Cargo includes perishable items, such as cocoa, shrimp, bananas and other fresh produce; and non-perishables, including, by way of example, lumber and steel for use in building and construction, and salt used by the City of New York for road safety in cold weather.

***The Barges Are Owned by the Port Authority of New York and New Jersey and Are Not Subject to Maritime Liens***

7. As reflected in the Bareboat Charter Party Agreement ("BC Agreement") between the

Port Authority of New York and New Jersey ("Port Authority") and American, the Port Authority owns the Barges and has chartered them to American (Exh. C). In this regard, the BC Agreement states:

> WHEREAS, the Port Authority is the Owner of the deck barges known as the **"NEW YORK,"** identified with Official No. 900643, and the **"NEW JERSEY,"** identified with Official No. 1033082 ...

8. The Barges are also registered with the United States Coast Guard as owned by the Port Authority. A copy of the Coast Guard registration documentation, as reflected on the Coast Guard website, is annexed as Exhibit D. As is clear from the registration print-out, the Coast Guard registration numbers, 900643 and 1033082 (Exh. D), correspond with the registration numbers that appear in the BC Agreement (Exh. C). To be clear, the Port Authority owns the Barges. And, the Port Authority charges American $152,981.78 every month in connection with American's dockage of the Barges.

9. Under the BC Agreement, the Barges are not permitted to be liened (BC Agreement, ¶18, Exh. C). In this regard, the BC Agreement states:

> Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners of the vessels (*Id.*).

10. On June 3, 2011, when the Barges were arrested, the Port Authority notified counsel for plaintiff that the Barges are publicly owned and thus not subject to arrest. In this regard, Melissa Banks, Counsel to the Port Authority wrote:

> This afternoon, I was made aware that Moran Towing Corporation [] caused a Port Authority barge [the New York] to be arrested in Brooklyn, New York and that Moran now seeks to arrest an additional Port Authority barge [the New Jersey] located in Newark, New Jersey (Exh. E).

Thereafter, Ms. Banks wrote that the arrest of the New York was "invalid" (*Id.*). As shown in American's accompanying Memorandum of Law, the Port Authority is right. As public property, the Barges are not subject to maritime liens and cannot, as a matter of law, be arrested or seized to satisfy an alleged debt of a private third party (Memorandum of Law, Point I).

### *The Towing Agreement Pertains to a Different Towing Company That Did Not Exist in 1998, When the Towing Agreement Was Signed*

11.  Plaintiff bases the claims in its Complaint upon a towing agreement ("Towing Agreement") which it claims to have entered into with American (Complaint, ¶6, Exh. B). However, the Towing Agreement (Exh. A) clearly states that it was entered into in *1998* between American and a "Moran Towing & Transportation Co., Inc" ("MT&TCI") -- not Moran Towing Corporation ("MTC") (plaintiff). A search of the Secretary of State's Business Registration Database confirms that MT&TCI -- the actual signatory on the Towing Agreement -- went out of business in *1996* and is now inactive (Exh. F). Thus, the party of the first part to the Towing Agreement, MT&TCI, did not exist at the time the Towing Agreement was signed, and, in any case, is not the plaintiff here.

12.  Furthermore and perhaps more importantly, plaintiff identifies itself in the Complaint as "Moran Towing Corporation" (MTC) -- as opposed to "Moran Towing & Transportation Co., Inc." (MT&TCI) -- the signatory to the Towing Agreement (Exh. A).

### *The Towing Agreement Does Not Pertain to the Barge New Jersey*

13.  Although the Complaint alleges that the Towing Agreement pertains to both Barges, in fact, the Towing Agreement states simply that it pertains to a single barge - ex BOSTON TRADER (now, the Barge New York), or an equivalent *substitute* for that Barge -- not any and all *additional* barges designated by American. In this regard, the Towing Agreement contains the

following language:

> Moran agrees to furnish the services of a tug [] which will satisfy the reasonable requirements of [American's] underwriter's surveyors for this towage service to tow BOSTON TRADER *or Equivalent substitute,* subject to a "walk round" survey ...

(Towing Agreement, p. 1). The Towing Agreement does not make any generic reference to any "additional" barges or any specific reference to the Barge New Jersey (*Id.*).

14. American did not draw the Towing Agreement. MT&TCI and/or its counsel drew it. If the intention was to permit the towing company to impress a lien under the terms of the Towing Agreement against any and all barges towed, it was incumbent on MT&TCI and/or its counsel to make it clear. As it is, the Towing Agreement, as written, provides no notice that it would apply to any barge other than the New York or a substitute for the New York. And American has never substituted any barge for the New York.

### *Without Use of the Barges, American Would Be Driven Out of Business*

15. The Barges are the only barges that American has at its disposal. And, until the orders granting arrest, the Barges were in constant use, *each* bringing cargo across the East and Hudson Rivers 4-5 times per week. The Barges transport 2,500 tons of cargo *each* per transshipment. In other words, American uses the Barges to transport 20,000 to 25,000 tons of cargo per week. Upon completion of each transhipment, cargo is unloaded for shipment by truck or rail.

16. Without the Barges, American's business would come to a halt, since American would be unable to transport any of the cargo across the Hudson and East Rivers. Hence, shippers with cargo already en route carried by freighters and other large cargo ships, would arrive at the Port Facilities, and American would be unable to tranship and transport it.

17. At present, the Port Facilities are scheduled to receive six (6) large vessels from July

6

5th to July 13th, delivering and receiving cargo that must be transhipped across the Hudson and East Rivers:

| Arrival Date | Ships | Cargo on and off |
| --- | --- | --- |
| July 6, 2011 | Vega Nikolas | >400 containers |
| July 7, 2011 | Letoile | >450 containers |
| July 7, 2011 | Hofuf | >100 containers, trucks and equipment |
| July 8, 2011 | Gabon | >420 containers |
| July 10, 2011 | Duncan Island | >110 refrigerated containers |
| July 13, 2011 | Spica | >400 containers[2] |

The cargo to be shipped on the Duncan Island includes bananas and other perishable items. Those perishables would be destroyed.

18. More importantly, American's reputation will also be destroyed. I have been in the business nearly all of my adult life. I am absolutely certain that, if shippers cannot be fully assured that their cargo will be transhipped and delivered on schedule, they will terminate their relationships with American. They rely upon American's ability to route their freight by rail to expedite delivery. And the ships referenced above are already en route from South America, the Middle East, and Europe. Once the word gets out that American has no access to the Barges and cannot transport to rail, no shippers will deal with American in the future. And they will stop paying our receivables, as is custom in this business, which will deprive American of its operating capital. As it is, on June 9, 2011, Tradewinds Magazine printed an article about this case, calling attention to the Barges and the arrests (Exh. J).

*Impact of the Arrest on the Public*

---

[2] The numbers are approximations based upon shipping manifests and prior experience with each carrier.

7

19. In addition to its immediate impact on American, the destruction of its business would have a ripple effect, not only locally, but regionally and nationwide. *First*, the destruction of American's business would result in the loss of the 350 jobs.

20. *Second*, the destruction of American's business would affect American's customers and those with whom those customers transact. Cargo slated to be transhipped from Brooklyn to Newark by the Barges for transport by rail would be left stranded at the dock. Use of trucks to transport the cargo would not resolve the problem because trucks simply lack the cargo capacity that rail provides. In particular, whereas the Barges can tranship 2,500 tons of cargo per trip across the Hudson and East Rivers in approximately one hour, *trucks can transport just one container at a time (20-40 tons)* during a trip over the roads and highways that would likely take twice the period of time of each barge crossing. Even assuming American could arrange for enough trucks to move all of the cargo that would be left at the dock (which is impossible), the additional time necessary to make the trip would result in missed connections and further delays in delivery. Manufacturers awaiting their goods for fabrication of their products, and distributors and retailers awaiting their goods for sale and delivery to their customers, would be stranded. As it is, six ships are slated to arrive within the next eight (8) days with nearly 2,000 containers of cargo. The damage caused would be in the tens of millions of dollars. And because shipments are arranged months in advance, the destruction of American's business would affect, not only those shippers and truckers en route, but also those scheduled to arrive in the days, weeks and months to come.

21. *Third*, the arrests, should they continue, would also cause harm to the rail lines which would be deprived of the revenue they were slated to receive for transporting the cargo that would be rendered undeliverable. Instead of being transported to Newark and the rail line at that location,

8

the cargo would be left stranded at the RHCT and, in the case of perishable items, left to rot. Similarly, trucking companies, which have been scheduled to retrieve and transport goods arriving at American's Port Facilities would arrive, but there would be no cargo to load onto their trucks, should the arrests continue.

22. Considering the sheer amount of cargo slated to arrive, the threatened harm here cannot be overstated. As mentioned at the outset, American handles approximately 2.5 Million tons of goods and other materials per year. That is in excess of 70,000 containers, plus breakbulk cargo. Were the distribution of cargo slated to be loaded and unloaded from American's Port Facilities to be disrupted as a consequence of the June 2 Ex Parte Order, the damage would be in the tens of millions of dollars.

23. Aside from the damage addressed above, the general public would suffer severe harm as a result of the June 2 Ex Parte Order. If American's Port Facilities are eliminated, which is an absolute certainty if the June 2 Ex Parte Order is allowed to stand, the New York Metropolitan area, once the disruption (above) is eventually stabilized (which could take years), would be resigned to receiving its goods and other materials by overland transportation, namely trucks. Given the volume of cargo at issue, the number of trucks traveling to and from New York City, principally by bridge, would increase by approximately 200,000 trips per year, roughly 800 more truck trips *per day*. One can only imagine the impact such an increase would have on public safety traffic, congestion, and air quality.[3]

---

[3] Although not necessarily relevant to this motion, I feel constrained to point out that American paid for the month of June, in advance, for the towing services received during that month. American has the wherewithal to continue paying for towing services on a current basis and has been doing so.

* * * * * * * *

I have devoted most of my adult life to creating, maintaining and developing American's business. I love my work and my business which, in my view, serves an important role in New York. I respectfully implore the Court to vacate the June 2 Ex Parte Order and, instead, allow American to continue its work.[4]

_____
Sabato Catucci

Sworn before me this
5th day of July, 2011

_____
Notary Public

Deborah Carrajat
Notary Public
Ocean County, New Jersey
My Commission Expires 01-03-2016

---

[4] I recognize that a bond could conceivably resolve the maritime lien wrongfully impressed against the Barges. But we have fully explored this course of action and it simply is not feasible. We contacted half a dozen sureties and banks. Each informed us and our representatives that sureties do not issue bonds without cash collateral, comparable liquid collateral, or a letter of credit. American does not have $1.3 Million in cash with which to collateralize a bond that would be required here. (Several sureties demanded 200% of the alleged lien or $2.6 Million.) We certainly do not possess treasury bills of comparable worth. Nor do we have the liquidity necessary to obtain a letter of credit. If the arrests are not lifted and American is not permitted to use the Barges, American is out of business - today.

12

Deborah Canajei
Notary Public
Bergen County, New Jersey
My Commission Expires 01-03-2015